**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| FAISAL HUSSAIN, derivatively on behalf of COMMUNITY HEALTH SYSTEMS, INC., | |
| Plaintiff, | C.A. No. _____ |
| v. | |
| WAYNE T. SMITH, LARRY CASH, THOMAS J. AARON, JOHN A. CLERICO, MICHAEL DINKINS, JAMES S. ELY III, JOHN A. FRY, TIM L. HINGTGEN, WILLIAM NORRIS JENNINGS, K. RANGA KRISHNAN, JULIA B. NORTH, and H. JAMES WILLIAMS, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| COMMUNITY HEALTH SYSTEMS, INC., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Faisal Hussain ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Community Health Systems, Inc. ("Community Health" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Wayne T. Smith, H. Larry Cash, Thomas J. Aaron, John A. Clerico, Michael

1

Dinkins, James S. Ely, John A. Fry, Tim L. Hingtgen, William Norris Jennings, K. Ranga Krishnan, Julia B. North, and H. James Williams (collectively, the "Individual Defendants," and together with Community Health, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Community Health, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Community Health, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Community Health's directors and officers from February 20, 2017 through the present (the "Relevant Period").

2.      Community Health provides healthcare services in the 113 hospitals that they own or lease, focusing on general acute care services. The Company operates hospitals in 20 states, employing approximately 2,000 physicians as of December 31, 2018.

3.      During the Relevant Period, the Individual Defendants made and/or caused the Company to make false and misleading statements indicating that the Company had accounted accurately for its allowance for bad accounts[1] and its contractual adjustments.[2] These

---

[1] Also called contractual allowances, this represents the amount that the Company has already charged but that it estimates customers will be unable to pay.

misstatements also caused the Company's net operating revenue to be overstated and its net losses to be understated.

4.     The Company adopted a new Accounting Standards Update ("ASU") 2014-09 on January 1, 2018 that changed the way Community Health recognized revenue. Largely in conjunction with this change, the Company began to reexamine its prior financial statements, as well as implement ASU 2014-09 to its future statements. This resulted in the first statement under the new guidelines, an annual report on Form 10-K, essentially restating the previous year's financial results.

5.     On February 27, 2018, Community Health revealed in a press release, filed by the Company in a current report on Form 8-K with the SEC that same day, that it expected its net revenue to drop for the final quarter and fiscal year ended December 31, 2017, due to previously under-reported provisions for bad accounts and contractual adjustments.

6.     On this news, the price per share of Community Health stock dropped $1.06 (over 17%) from a close of $6.18 on February 27, 2018 to close at $5.12 on February 28, 2018.

7.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company under-recorded its bad accounts allowance; (2) the Company under-recorded its contractual adjustments; (3) consequently, the Company had over-recorded its net operating revenue; (4) similarly, the Company had under-recorded its net losses; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

---

[2] This represents the difference between what the Company will charge for healthcare services and what it will actually be paid. The name references the fact that this amount is determined by contracts with either private insurers or the government.

8.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

9.     Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. The Company repurchased 532,300 shares of its common stock at inflated prices between February 1, 2017 and January 31, 2018 for over $4.87 million. As the Company's stock was actually only worth $4.20 per share, the lowest price at which it was trading on March 1, 2018, the Company overpaid approximately $2.6 million in total.

10.     In light of the Individual Defendants' misconduct, which has subjected Community Health, its Chairman and Chief Executive Officer ("CEO"), and its former and current Executive Vice President and Chief Financial Officer ("CFO"), to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Middle District of Tennessee (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

11.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's and former and current CFO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Community Health's Board of Directors

(the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

13.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

17.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

18.     Venue is proper in this District because Community Health and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

19.     Plaintiff is a current shareholder of Community Health common stock. Plaintiff has continuously held Community Health common stock at all relevant times.

### Nominal Defendant Community Health

20.     Community Health is a Delaware corporation with its principal executive offices at 4000 Meridian Boulevard, Franklin, TN, 37067. Community Health's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "CYH."

### Defendant Smith

21.     Defendant Wayne T. Smith ("Smith") has served as the Company's CEO and as a Company director since 1997, and as its Chairman since 2001. He previously served as the President of the Company from 1997 to 2014. According to the Company's Schedule 14A filed with the SEC on April 4, 2019 (the "2019 Proxy Statement"), as of March 18, 2019, Defendant Smith beneficially owned 2,802,545 shares of the Company's common stock, which represented 2.4% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on March 18, 2019 was $4.32, Smith owned over $12.1 million worth of Community Health stock.

22.     For the fiscal year ended December 31, 2017, Defendant Smith received $4,945,992 in compensation from the Company. This included $1,600,000 in salary, $1,378,500 in restricted stock awards, $812,000 in non-equity incentive plan compensation, a change in pension value and deferred compensation of $1,055,772, and $99,720 in all other compensation.

23.     The Company's 2019 Proxy Statement stated the following about Defendant Smith:

> Mr. Smith is our Chairman and Chief Executive Officer. Mr. Smith joined the company in 1997 and was subsequently elected to the Board. He is one of the most tenured executives in the hospital industry and has led the Company's growth to become one of the largest publicly traded hospital companies in the

nation. He serves on the boards of the Federation of American Hospitals and Auburn University.

**Defendant Cash**

24.     Defendant W. Larry Cash ("Cash") served as Community Health's CFO and Executive Vice President from 1997 to 2017, as a Company director from 2001 to May 2017. According to the 2019 Proxy Statement, as of March 19, 2019, Defendant Smith beneficially owned 661,152 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 19, 2018 was $4.33, Cash owned approximately $2.86 million worth of Community Health stock.

25.     For the fiscal year ended December 31, 2017, Defendant Cash received $1,125,761 in compensation from the Company, despite retiring in May of that year. This included $332,019 in salary, $294,080 in restricted stock awards, $412,866 in pension value and deferred compensation, and $96,796 in other compensation.

26.     The Company's Schedule 14A filed with the SEC on April 6, 2017 (the "2017 Proxy Statement") states the following about Defendant Cash:

> Mr. Cash will be retiring as our President of Financial Services and Chief Financial Officer effective at the 2017 Annual Meeting. Mr. Cash joined us as Executive Vice President and Chief Financial Officer in 1997. In 2001, he was also named to our Board of Directors. In January 2014, he was named our President of Financial Services. Prior to joining us, he served as vice president and group chief financial officer of Columbia/HCA Healthcare Corporation from September 1996 to August 1997. Prior to Columbia/HCA, Mr. Cash spent 23 years at Humana Inc., most recently as senior vice president of finance and operations from 1993 to 1996. He is also a director of Cross Country Healthcare, Inc., a provider of nurse and allied staffing services, multi-specialty locum tenens services, and other human capital management services in the healthcare industry, and he serves on its audit (chair) and compensation committees.

**Defendant Aaron**

27.     Defendant Thomas J. Aaron ("Aaron") has served as the Company's CFO and Executive Vice President since May 2017. According to the 2019 Proxy Statement, as of March 18, 2019, Defendant Aaron beneficially owned 408,011 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March

18, 2019 was $4.32, Aaron owned approximately $1.76 million worth of Community Health stock.

28.     For the fiscal year ended December 31, 2017, Defendant Aaron received $1,749,244 in compensation from the Company. This included $646,875 in salary, a bonus of $25,000, $413,150 in restricted stock awards, $646,875 in non-equity incentive plan compensation, and $17,344 in other compensation.

29.     The Company's 2019 Proxy Statement stated the following about Defendant Aaron:

> **Thomas J. Aaron** serves as Executive Vice President and Chief Financial Officer. Mr. Aaron joined us in November 2016 as Senior Vice President – Finance, and, in May 2017, he was promoted to Executive Vice President and Chief Financial Officer. Prior to joining us, he was with Deloitte & Touche LLP for 32 years. Mr. Aaron served as Deloitte's Tennessee Managing partner from 2006 to 2016. His healthcare industry experience at Deloitte included audits of public and private companies, strategy and operations improvement consulting, mergers and acquisitions, financing and public equity offering services, and participation in numerous board and committee meetings. As a partner at Deloitte, Mr. Aaron was the lead client service and lead assurance partner on our external audit from 1996 to 2003 and from 2008 to 2013. He serves as a Master's of Accounting Advisory Board member for the University of Kentucky.

**Defendant Hammons**

30.     Defendant Kevin J. Hammons ("Hammons") has served as the Company's Chief Accounting Officer and Senior Vice President since 2012.

31.     The Company's 2019 Proxy Statement stated the following about Defendant Hammons:

> **Kevin J. Hammons** serves as Senior Vice President, Assistant Chief Financial Officer, Chief Accounting Officer and Treasurer. He is responsible for SEC reporting matters, as well as overseeing other accounting and financial reporting matters, including consolidations, budgeting and the design and implementation of financial systems and processes. He also oversees the corporate finance and treasury management functions. Mr. Hammons joined us in 1997 and, in 2002, he was promoted to assistant vice president, financial reporting. In 2005, he was promoted to vice president, financial reporting. In 2012, he was promoted to vice president (later senior vice president) and chief accounting officer. In 2017, he

was named assistant chief financial officer, and in 2018, he was also named treasurer. Prior to joining us, he served in various positions in the assurance and advisory services practice at Ernst & Young LLP.

**Defendant Clerico**

32.     Defendant John A. Clerico ("Clerico") has served as a Company director since 2003. He also serves as Chairman of the Compensation Committee and as a member of the Audit & Compliance Committee.[3] According to the 2019 Proxy Statement, as of March 18, 2019, Defendant Clerico beneficially owned 141,310 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2019 was $4.32, Clerico owned approximately $610,459 worth of Community Health stock.

33.     For the fiscal year ended December 31, 2017, Defendant Clerico received $307,497 in compensation from the Company. This included $137,500 in fees earned or cash paid and $169,997 in restricted stock awards.

34.     The Company's 2019 Proxy Statement stated the following about Defendant Clerico:

> Mr. Clerico brings executive leadership experience to the Board. He has held positions of chairman of the board, chief executive officer, co-chief operating officer, chief financial officer and treasurer during various points in his career working for such notable companies as Praxair and Union Carbide. He is currently chairman and registered financial advisor of ChartMark Investments.

**Defendant Dinkins**

35.     Defendant Michael Dinkins ("Dinkins") has served as a Company director since December 2017. He also serves as a member of the Audit & Compliance Committee. According to the 2019 Proxy Statement, as of March 18, 2019 Defendant Dinkins beneficially owned 18,028 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2019 was $4.32, Dinkins owned approximately $77,880 worth of Community Health stock.

---

[3] Defendant Clerico served in these roles in 2018 and 2019. He acted as the Chairman of the Audit & Compliance Committee and a member of the Compensation Committee in 2017.

36.    For the fiscal year ended December 31, 2017, Defendant Dinkins received a prorated amount of $6,522 in compensation, all in cash fees, from the Company. For the fiscal year ended December 31, 2018, Defendant Dinkins received $290,000 in compensation, including $120,000 in cash fees and $170,000 in restricted stock awards.

37.    The Company's 2019 Proxy Statement stated the following about Defendant Dinkins:

> Mr. Dinkins brings extensive experience to the Board based on his prior service as a board member and chief financial officer of Integer Holdings Corp., a publicly-traded company, as well as knowledge of complex financial and operational issues facing large organizations and an understanding of operations and financial strategy in challenging environments. He is currently president and chief executive officer of Dinkins Financial, a consulting company that helps small businesses gain access to capital.

### Defendant Ely

38.    Defendant James S. Ely III ("Ely") has served as a Company director since 2009. He also serves as Chairman of the Audit & Compliance Committee. According to the 2019 Proxy Statement, as of March 18, 2019, Defendant Ely beneficially owned 91,310 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2019 was $4.32, Ely owned approximately $394,459 worth of Community Health stock.

39.    For the fiscal year ended December 31, 2017, Defendant Ely received $299,997 in compensation from the Company. This included $130,000 in fees earned or cash paid and $169,997 in restricted stock awards.

40.    The Company's 2019 Proxy Statement stated the following about Defendant Ely: "Mr. Ely founded PriCap Advisors LLC in 2009 and has served as its chief executive officer since inception. He has extensive banking experience having worked as senior banker and managing director in JP Morgan's syndicated and leveraged finance group."

**Defendant Fry**

41.    Defendant John A. Fry has served as a Company director since 2004. He also serves as a member of the Compensation Committee and the Governance & Nominating Committee.[4] According to the 2019 Proxy Statement, as of March 18, 2019, Defendant Fry beneficially owned 73,013 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2019 was $4.32, Fry owned approximately $315,416 worth of Community Health stock.

42.    For the fiscal year ended December 31, 2017, Defendant Fry received $289,997 in compensation from the Company. This included $120,000 in fees earned or cash paid and $169,997 in restricted stock awards.

43.    The Company's 2019 Proxy Statement stated the following about Defendant Fry:

Mr. Fry currently serves as president of Drexel University in Philadelphia, Pennsylvania. Prior to that, he served as president of Franklin & Marshall College in Lancaster, Pennsylvania. Mr. Fry has unique experience as the president of an academic institution along with prior experience with the University of Pennsylvania health system.

**Defendant Hingtgen**

44.    Defendant Tim L. Hingtgen ("Hingtgen") has served as the Company's President and Chief Operating Officer ("COO") since September 1, 2016, and he has served as a Company director since 2017. According to the 2019 Proxy Statement, as of March 18, 2018, Defendant Hingtgen beneficially owned 525,024 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2019 was $4.32, Hingtgen owned approximately $2.27 million worth of Community Health stock.

---

[4] Defendant Fry has occupied these committee positions in 2018 and 2019. He was a member of the Audit & Compliance Committee and the Governance & Nominating Committee in 2017.

45. For the fiscal year ended December 31, 2017, Defendant Hingtgen received $2,209,826 in compensation from the Company. This included $800,000 in salary, $689,250 in restricted stock awards, $312,000 in non-equity incentive plan compensation, a change in pension value and deferred compensation of $393,318, and $15,258 in all other compensation.

46. The Company's 2019 Proxy Statement stated the following about Defendant Hingtgen: "Mr. Hingtgen is our President and Chief Operating Officer and joined the company in 2008. Mr. Hingtgen has over 20 years of healthcare management experience and is a highly accomplished hospital operator with a track record of successfully optimizing hospital operations and developing regional healthcare networks."

**Defendant Jennings**

47. Defendant William Norris Jennings ("Jennings") has served as a Company director since 2008. He also serves as a member of the Governance & Nominating Committee. According to the 2019 Proxy Statement, as of March 18, 2019, Defendant Jennings beneficially owned 73,489 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2019 was $4.32, Jennings owned approximately $317,472 worth of Community Health stock.

48. For the fiscal year ended December 31, 2017, Defendant Jennings received $289,997 in compensation from the Company. This included $120,000 in fees earned or cash paid and $169,997 in restricted stock awards.

49. The Company's 2019 Proxy Statement stated the following about Defendant Jennings: "Dr. Jennings is currently retired after more than 43 years as a practicing family medicine physician, most recently with KentuckyOne Health in Louisville, Kentucky. He brings

a recently-practicing physician's perspective to the Board and has hands on experience managing large physician practices."

**Defendant Krishnan**

50.     Defendant K. Ranga Krishnan ("Krishnan") has served as a Company director since 2017. He also serves as a member of the Governance & Nominating Committee. According to the 2019 Proxy Statement, as of March 18, 2019, Defendant Krishnan beneficially owned 12,373 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2019 was $4.32, Krishnan owned approximately $53,451 worth of Community Health stock.

51.     For the fiscal year ended December 31, 2017, Defendant Krishnan received a prorated amount of $6,522 in compensation, all in cash fees, from the Company. For the fiscal year ended December 31, 2018, Defendant Krishnan received $290,000 in compensation from the Company. This included $120,000 in fees earned or cash paid and $170,000 in restricted stock awards.

52.     The Company's 2019 Proxy Statement stated the following about Defendant Krishnan:

> Dr. Krishnan's service as the dean of two medical schools, including Rush and Duke-NUS, and as an executive and administrator at a large medical center provides the Board with valuable experience in the management of physician practices and in maintaining compliance with the complex regulatory requirements of the hospital and healthcare industries.

**Defendant North**

53.     Defendant Julia B. North ("North") has served as a Company director since 2004, and she is currently the Lead Director. She also serves as a member of the Compensation Committee and as the Chairman of the Governance & Nominating Committee. According to the 2019 Proxy Statement, as of March 18, 2019, Defendant North beneficially owned 96,939 shares of the Company's common stock. Given that the price per share of the Company's common

stock at the close of trading on March 18, 2019 was $4.32, North owned approximately $418,776 worth of Community Health stock.

54.     For the fiscal year ended December 31, 2017, Defendant North received $302,247 in compensation from the Company. This included $132,250 in fees earned or cash paid, and $169,997 in restricted stock awards.

55.     The Company's 2019 Proxy Statement stated the following about Defendant North: "Ms. North is our Lead Director. She is currently retired. Ms. North has served in many senior executive positions including president of consumer services for Bellsouth Telecommunications. She currently serves on the board of directors of Acuity Brands, Inc."

**Defendant Williams**

56.     Defendant H. James Williams ("Williams") has served as a Company director since 2015. He also serves as a member of the Audit & Compliance Committee. According to the 2019 Proxy Statement, as of March 18, 2019, Defendant Williams beneficially owned 38,189 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 18, 2019 was $4.32, Williams owned approximately $164,976 worth of Community Health stock.

57.     For the fiscal year ended December 31, 2017, Defendant Williams received $289,997 in compensation from the Company. This included $120,000 in fees earned or cash paid and $169,997 in restricted stock awards.

58.     The Company's 2019 Proxy Statement stated the following about Defendant Williams: "Dr. Williams currently serves at the president of Mount St. Joseph University in Cincinnati, Ohio. Prior to that, he served as president of Fisk University in Nashville, Tennessee. He brings diverse experience in finance, law and higher education to the Board."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

59.     By reason of their positions as officers, directors, and/or fiduciaries of Community Health and because of their ability to control the business and corporate affairs of Community Health, the Individual Defendants owed Community Health and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Community Health in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Community Health and its shareholders so as to benefit all shareholders equally.

60.     Each director and officer of the Company owes to Community Health and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

61.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Community Health, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

62.     To discharge their duties, the officers and directors of Community Health were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

63.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Community Health, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders

that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Community Health's Board at all relevant times.

64.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Additionally, the Individual Defendants had a duty not to cause the Company to waste corporate assets by making the Company repurchase its own stock at artificially inflated prices, to the detriment of the Company and its shareholders.

65.     To discharge their duties, the officers and directors of Community Health were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Community Health were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Tennessee, and the United States, and pursuant to Community Health's own Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how Community Health conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Community Health and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Community Health's operations would comply with all applicable laws and Community Health's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

66.      Each of the Individual Defendants further owed to Community Health and the shareholders the duty of loyalty requiring that each favor Community Health's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

67. At all times relevant hereto, the Individual Defendants were the agents of each other and of Community Health and were at all times acting within the course and scope of such agency.

68. Because of their advisory, executive, managerial, and directorial positions with Community Health, each of the Individual Defendants had access to adverse, non-public information about the Company.

69. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Community Health.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

70. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

71. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act.

72. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual

Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Community Health, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

73.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

74.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Community Health and was at all times acting within the course and scope of such agency.

## COMMUNITY HEALTH'S CODE OF CONDUCT

75.     The Company's Code of Conduct (the "Code of Conduct"), states that it guides "all persons and businesses associated with [the Company] and its subsidiaries," though it is explicitly the role of "all managers, directors, supervisors, board members, and corporate staff… to set the example by conducting their business affairs consistent with the highest legal and ethical standards."

76.     The Code of Conduct provides, in its initial "Statement of Beliefs," that the Company is "dedicated to compliance with all federal, state, and local laws, rules, and regulations, including… billing and documentation guidelines, and financial arrangements."

77.     Elaborating on its policy of compliance with rules and regulations, the Code of Conduct provides that:

> Facilities and colleagues must comply with all applicable federal, state, and local laws, rules, and regulations. Any colleague who witnesses or suspects any violations of any law or regulation must immediately report said violation or suspected violation to a supervisor, the Facility Compliance officer, the Corporate Compliance and Privacy Officer, or the Confidential Disclosure Program.

78.     The Code of Conduct states that the Company is "committed to full, fair, accurate, timely, and clear disclosure in reports and documents that we file with or submit to government agencies, as well as in other public communications or in material that we develop for internal use." In elaboration, the Code of Conduct states that:

> As a public organization, our integrity and reputation depend upon the accuracy and completeness of our financial statements. All accounts and financial records must be maintained strictly in accordance with the CHSPSC Financial Policies and Procedures, as amended from time to time. Colleagues must always keep in mind that each bookkeeping and financial entry will ultimately be incorporated into our consolidated financial statements. Our consolidated financial statements are certified by our officers as being true and correct and not misleading and are presented to the public and the federal government in accordance with generally accepted accounting principles and all Securities and Exchange Commission rules and regulations. All personnel who make bookkeeping and financial entries, prepare financial reports and statements, and disperse assets (especially cash) have special ethical obligations as you perform your duties.

79.     The Individual Defendants violated the Code of Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act, and failing to report the same.

## COMMUNITY HEALTH'S AUDIT & COMPLIANCE COMMITTEE CHARTER

80.     The Company's Audit & Compliance Committee Charter provides that the Committee shall "assist the Board of Directors in its oversight of (1) the integrity of the

Company's financial statements, [and] (2) the Company's compliance with legal and regulatory requirements," including use of the proper accounting methods.

81.     The Audit & Compliance Committee Charter also provides that the members of the Committee must "[b]ecome familiar with the accounting and reporting principles and practices applied by the Company in preparing its financial statements."

82.     Specifically addressing accounting standards, the Charter provides that the Committee must examine all changes and potential changes in accounting practices and ensure that financial information is reported properly:

> Obtain and review a report from the Independent Accountant regarding (1) all critical accounting policies and practices to be used, (2) all alternative treatments of financial information within GAAP that have been discussed with management and the ramifications of the use of such alternative disclosures and treatments, (3) the treatment preferred by the Independent Accountant, and (4) other written communications such as any management letters or schedule of unadjusted differences.

83.     Finally, the Audit & Compliance Committee is also tasked with overseeing the Company's internal controls. The Charter provides that the Committee must:

> Obtain and review reports from Management assessing the effectiveness of the Company's internal control structure and procedures for financial reporting, including (1) all significant deficiencies or material weaknesses in the design or operation of internal controls, (2) any fraud, whether or not material, that involves Management or other employees having a significant role in the internal controls, and (3) all significant changes to internal controls, including corrective actions, since the last report to the Committee.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

84.     Community Health owns, leases, and operates hospitals in 20 states, and purports to be "one of the largest publicly-traded hospital companies in the United States."

85.     The Company adopted ASU 2014-09, which changed its manner of revenue recognition, on January 1, 2018. For several months preceding the adoption of ASU 2014-09, the Company elected to examine its methods for estimating two types of allowances that affect its net operating income and net losses: the allowance for bad accounts and contractual allowances.

86.     Starting from February 20, 2017, the Company issued multiple statements through SEC filings and press releases indicating that the Company had accounted accurately for its allowance for doubtful accounts and its contractual adjustments. These misstatements also caused the Company's net operating revenue to be overstated and its net losses to be understated.

**False and Misleading Statements**

*February 20, 2017 Form 8-K and Press Release*

87.     On February 20, 2017, Community Health issued a press release which was also attached to its Form 8-K filed with the SEC, announcing its financial results for the 2016 fiscal year ended December 31, 2016. The press release stated that the Company's net operating revenue for fiscal 2016 had been $18.438 billion, with a net loss of $1.721 billion and an adjusted EBITDA of $564 million.

*February 21, 2017 Form 10-K*

88.     On February 21, 2017, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K"). The 2016 10-K was signed by Defendants Smith, Cash, Hammons, Clerico, Ely, Fry, Jennings, North, Williams, and non-Defendant H. Mitchell Watson.

89.     The 2016 10-K repeated the financial results from the previous day's press release, and offered the following about its methods of calculating its allowance for doubtful accounts and contractual adjustments:

Net operating revenues include amounts estimated by management to be reimbursable by Medicare and Medicaid under prospective payment systems and provisions of cost-reimbursement and other payment methods. In addition, we are reimbursed by non-governmental payors using a variety of payment methodologies. Amounts we receive for treatment of patients covered by these programs are generally less than the standard billing rates. *Contractual allowances are automatically calculated and recorded through our internally developed "automated contractual allowance system." Within the automated system, payors' historical paid claims data are utilized to calculate the contractual allowances. This data is automatically updated on a monthly basis.* All hospital contractual allowance calculations are subjected to monthly review by management to ensure reasonableness and accuracy. We account for the differences between the estimated program reimbursement rates and the standard billing rates as contractual allowance adjustments, which we deduct from gross revenues to arrive at operating revenues (net of contractual allowances and discounts). *The process of estimating contractual allowances requires us to estimate the amount expected to be received based on payor contract provisions. The key assumption in this process is the estimated contractual reimbursement percentage, which is based on payor classification and historical paid claims data. Our automated contractual allowance system does not maintain the contractual allowance at the patient account level as it estimates an average contractual allowance by payor classification. Due to the complexities involved in these estimates, actual payments we receive could be different from the amounts we estimate and record.*

(Emphasis added).

### April 6, 2017 Proxy Statement

90.     The Company filed its 2017 Proxy Statement with the SEC on April 6, 2017.

Defendants Smith, Aaron, Clerico, Dinkins, Ely, Fry, Hingtgen, Jennings, Krishnan, North, and

Williams solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange

Act, which contained material misstatements and omissions.[5]

91.     The 2017 Proxy Statement stated, regarding the Company's Code of Conduct,

that:

---

[5] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

> The Company has a robust compliance program, the cornerstone of which is our Code of Conduct. Our Code of Conduct has been adopted and implemented throughout our organization and is applicable to all members of the Board of Directors and our officers, as well as employees of our subsidiaries. A variation of this Code of Conduct has been in effect at our Company since 1997.

92.    The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein and the Individual Defendants' failures to report violations of the Code of Conduct.

93.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including equity awards designed to "effectively align the interests of management with those of stockholders," while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

94.    The 2017 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company under-recorded its bad accounts allowance; (2) the Company under-recorded its contractual adjustments; (3) consequently, the Company had over-recorded its net operating revenue; (4) similarly, the Company had under-recorded its net losses; and (5) the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

### *May 1, 2017 Form 8-K and Press Release*

95.    On May 1, 2017, Community Health announced its financial results for its third fiscal quarter ended March 31, 2017 in a press release also attached to the Company's Form 8-K filed with the SEC. The press release stated that the Company's net operating revenue for the

first quarter of 2017 had been $4.486 billion, with a net loss of $199 million and an adjusted

EBITDA of $527 million.

### *May 2, 2017 Form 10-Q*

96.     On May 2, 2017, the Company filed its quarterly report with the SEC for the

period ended March 31, 2017 on a Form 10-Q (the "1Q17"). The 1Q17 was signed by

Defendants Smith, Cash, and Hammons.

97.     The 1Q17, after repeating the financial results from the previous day's press

release, stated that the Company would be adopting an Accounting Standards Update that would

change its revenue recognition methods, altering its accounting for its provision for bad

accounts:

> In May 2014, the Financial Accounting Standards Board ("FASB") issued
> Accounting Standards Update ("ASU") 2014-09, which outlines a single
> comprehensive model for recognizing revenue and supersedes most existing
> revenue recognition guidance, including guidance specific to the healthcare
> industry. This ASU provides companies the option of applying a full or modified
> retrospective approach upon adoption. This ASU is effective for fiscal years
> beginning after December 15, 2017, with early adoption permitted for annual
> periods beginning after December 15, 2016. The Company expects to adopt this
> ASU on January 1, 2018 and is currently developing its plan for adoption and the
> impact on its revenue recognition policies, procedures and control framework and
> the resulting impact on its consolidated financial position, results of operations
> and cash flows. The Company has established an implementation group for this
> ASU with an implementation plan to transition to the new standard and determine
> its impact during 2017…
> Additionally, ***the adoption of the new accounting standard will impact the
> presentation on the Company's statement of operations for a significant
> component of its provision for bad debts. After adoption of the new standard,
> the majority of what is currently classified as the provision for bad debts will be
> reflected as an implicit price concession as defined in the standard and
> therefore an adjustment to net patient revenue.*** The Company will continue to
> evaluate certain changes in collectability on its self-pay patient accounts
> receivable resulting from certain credit and collection issues not assessed at the
> date of service, including bankruptcy, and recognize such amounts in the
> provision for bad debts included in operating expenses on the statement of

operations. The Company plans to elect to apply the full retrospective approach upon adoption. The Company cannot reasonably estimate at this time the quantitative impact that the adoption of this accounting standard will have on the financial statements of the Company.

(Emphasis added).

98.    Attached to the 1Q17 were SOX certifications signed by Defendants Smith and Cash attesting to the accuracy of the 1Q17.

### August 1, 2017 Form 8-K and Press Release

99.    On August 1, 2017, Community Health announced its financial results for its second quarter ended June 30, 2017 in a press release also attached the Company's Form 8-K filed with the SEC. The press release stated that the Company's net operating revenue for the second quarter of 2017 had been $4.144 billion, with a net loss of $137 million and an adjusted EBITDA of $435 million.

### August 2, 2017 Form 10-Q

100.    On August 2, 2017, the Company filed a quarterly report for the period ended June 30, 2017 (the "2Q17"), which was signed by Defendants Smith, Aaron, and Hammons.

101.    The 2Q17 confirmed the financial results that had been stated in the previous day's press release.

102.    Attached to the 2Q17 were SOX certifications signed by Defendants Smith and Aaron, attesting to the accuracy of the 2Q17.

### November 1, 2017 Form 8-K and Press Release

103.    On November 1, 2017, Community Health announced its financial results for its second quarter ended September 30, 2017 in a press release also attached to the Company's Form 8-K filed with the SEC. The press release stated that the Company's net operating revenue

for fiscal 2016 had been $3.666 billion, with a net loss of $110 million and an adjusted EBITDA of $331 million.

### *November 2, 2017 Form 10-Q*

104.    On November 2, 2017, the Company filed a quarterly report with the SEC for the period ended September 30, 2017 on a Form 10-K (the "3Q17"), which was signed by Defendants Smith, Aaron, and Hammons.

105.    The 3Q17 confirmed the financial results stated in the previous day's press release.

106.    Attached to the 3Q17 were SOX certifications signed by Defendants Smith and Aaron, attesting to the accuracy of the 3Q17.

107.    The statements in ¶¶ 87-89 and 95-106 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company under-recorded its bad accounts allowance; (2) the Company under-recorded its contractual adjustments; (3) consequently, the Company had over-recorded its net operating revenue; (4) similarly, the Company had under-recorded its net losses; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### **The Truth Emerges**

108.    On February 27, 2018, the Company filed Community Health announced its financial results for its second quarter ended December 31, 2017 in a press release also attached the Company's Form 8-K filed with the SEC. The press release stated, in relevant part:

> As required by generally accepted accounting principles, the Company adopted the new revenue recognition accounting standard on January 1, 2018. In

connection with this adoption, during the fourth quarter of 2017, the Company completed an extensive analysis of its patient revenues and patient accounts receivable and developed new accounting processes and methodologies. This analysis also included an evaluation of patient accounts receivable retained after the 2017 divestitures of 30 hospitals, and certain other revenues. Based on the information obtained related to the aforementioned adoption, *the financial results discussed below include a change in estimate recorded by the Company during the three months and year ended December 31, 2017 to increase contractual allowances and the provision for bad debts by approximately $591 million*.

(Emphasis added).

## Repurchases During the Relevant Period

109.     During the period in which the Company made false and misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock at artificially inflated prices that substantially damaged the Company. In total, the Company spent an aggregate amount of over $4.8 million to repurchase 532,300 shares of its own common stock at artificially inflated prices from February 1, 2017 through January 31, 2018.

110.     As the Company stock was actually only worth $4.20 per share, the lowest price on March 1, 2018, the Company overpaid over $2.6 million in total for these repurchases.

111.     According to the Company's Form 10-Q filed with the SEC on May 2, 2017, between February 1, 2017 and February 28, 2017,[6] the Individual Defendants caused the Company to repurchase 980 shares of its own common stock at an average price per share of approximately $6.58, for a total cost to the Company of $6,448.40. Between March 1, 2017 and March 31, 2017, the Individual Defendants caused the Company to repurchase 522,676 shares of its own stock, for a total cost of $4,803,392.40.

112.      Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company

---

[6] Upon information and belief, these repurchases were made during the Relevant Period.

paid on average $2.38 more than the actual worth of each share between February 1, 2017 and February 28, 2017 and $4.99 more than the actual worth between March 1, 2017 and March 31, 2017. Thus, the total over payment by the Company for repurchases of its own stock between February 1, 2017 and March 31, 2017 was $2,610,485.

113.    According to the Company's Form 10-Q filed with the SEC on August 2, 2017, between June 1, 2017 and June 30, 2017, the Individual Defendants caused the Company to repurchase 4,349 shares of its own common stock at an average price per share of approximately $9.17, for a total cost to the Company of $39,880.33.

114.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $4.97 more than the actual worth of each share between June 1, 2017 and June 30, 2017. Thus, the total over payment by the Company for repurchases of its own stock between June 1, 2017 and June 30, 2017 was over $21,614.

115.    According to the Company's Form 10-Q filed with the SEC on May 2, 2018, between January 1, 2018 and January 31, 2018, the Individual Defendants caused the Company to repurchase 4,295 shares of its own common stock at an average price per share of approximately $4.95, for a total cost to the Company of $21,260.25.

116.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $0.75 more than the actual worth of each share between January 1, 2018 and January 31, 2018. Thus, the total over payment by the Company for repurchases of its own stock between January 1, 2018 and January 31, 2018 was $3,221.25.

117.    In total, the Company overpaid an aggregate amount of $2,635,231 for repurchases of its own stock during the period of time in which the Company made false and misleading statements and omissions.

## DAMAGES TO COMMUNITY HEALTH

118.    As a direct and proximate result of the Individual Defendants' conduct, Community Health has lost and expended, and will lose and expend, many millions of dollars.

119.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its Chairman and CEO, and its former and current Vice President and CFO, and amounts paid to outside lawyers, accountants, and investigators in connection there and in connection with any required restatements of the Company's financial results during the Relevant Period.

120.    Such losses include, but are not limited to, approximately $2.6 million that the Company overpaid, at the direction of the Individual Defendants, for the Company's repurchases of its own stock at artificially inflated prices.

121.    Additionally, these expenditures include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

122.    As a direct and proximate result of the Individual Defendants' conduct, Community Health has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

123.    Plaintiff brings this action derivatively and for the benefit of Community Health to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Community Health, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

124.    Community Health is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

125.    Plaintiff is, and has continuously been at all relevant times, a shareholder of Community Health. Plaintiff will adequately and fairly represent the interests of Community Health in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

126.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

31

127.   A pre-suit demand on the Board of Community Health is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eleven people: Defendants Smith, Clerico, Dinkins, Ely, Fry, Hingtgen, Jennings, Krishnan, North, and Williams (collectively, the "Director-Defendants"), and non-Defendant Elizabeth T. Hirsch (together, the "Directors"). Plaintiff needs only to allege demand futility as to six of the eleven Directors that were on the Board at the time this action was commenced.

128.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

129.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

130.   Additional reasons that demand on Defendant Smith is futile follow. Defendant Smith has served as the Company's CEO since 1997, and as its Chairman since 2001.  He also served as the Company's President from 1997 to 2014.  Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Smith with his principal occupation, and he receives handsome compensation, including $4,945,992 during the fiscal year

ended December 31, 2017. Defendant Smith was ultimately responsible for all of the false and misleading statements and omissions that were made, including those in the 2016 10-K, which he signed and signed a SOX certification for. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Smith is a defendant in the Securities Class Action. For these reasons, too, Defendant Smith breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

131.    Additional reasons that demand on Defendant Clerico is futile follow. Defendant Clerico has served as a Company director since 2003 and serves as a member of the Audit & Compliance Committee and as a member of the Compensation Committee. He also served as the Chairman of the Audit & Compliance Committee during the Relevant Period. Defendant Clerico receives handsome compensation, including $359,066 during the fiscal year ended December 31, 2018. As a trusted Company director and both member and Chairman of the Audit & Compliance Committee he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Clerico signed, and thus personally made the false and misleading statements in, the 2016 10-K. For these reasons, too, Defendant Clerico breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

132.    Additional reasons that demand on Defendant Dinkins is futile follow. Defendant Dinkins has served as a Company director since 2017 and serves on the Audit & Compliance Committee.  Defendant Dinkins receives handsome compensation, including $290,000 during the fiscal year ended December 31, 2018. As a Company director and member of the Audit & Compliance Committee he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Dinkins breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

133.    Additional reasons that demand on Defendant Ely is futile follow. Defendant Ely has served as a Company director since 2009 and serves as the Chairman of the Audit & Compliance Committee. Defendant Ely receives handsome compensation, including $299,997 during the fiscal year ended December 31, 2017. As a trusted Company director and Chairman of the Audit & Compliance Committee he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Ely signed, and thus personally made the false and misleading statements, in the 2016 10-K. For these reasons, too, Defendant Ely breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

134.    Additional reasons that demand on Defendant Fry is futile follow. Defendant Fry has served as a Company director since 2004 and serves as a member of the Compensation

Committee and the Governance & Nominating Committee. He also served as a member of the Audit & Compliance Committee during the Relevant Period. Defendant Fry receives handsome compensation, including $289,997 during the fiscal year ended December 31, 2017. As a trusted Company director and member of the Audit & Compliance Committee he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarding his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Fry signed, and thus personally made the false and misleading statements, in the 2016 10-K. For these reasons, too, Defendant Fry breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

135.   Additional reasons that demand on Defendant Hingtgen is futile follow. Defendant Hingtgen has served as the Company's President and COO since September 2016, and as a Company director since 2017. Thus, as the Company admits, he is a non-independent director.   Community Health provides Defendant Hingtgen with his principal occupation; he receives handsome compensation, including $2,209,826 during the fiscal year ended December 31, 2017. As an officer and a trusted Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Hingtgen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

136.     Additional reasons that demand on Defendant Jennings is futile follow. Defendant Jennings has served as a Company director since 2008 and serves as a member of the Governance & Nominating Committee. Defendant Jennings receives handsome compensation, including $289,997 during the fiscal year ended December 31, 2017. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Jennings signed, and thus personally made the false and misleading statements in, the 2016 10-K. For these reasons, too, Defendant Jennings breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

137.     Additional reasons that demand on Defendant Krishnan is futile follow. Defendant Krishnan has served as a Company director since 2017 and serves as a member of the Governance & Nominating Committee. Defendant Krishnan receives handsome compensation, including $290,000 during the fiscal year ended December 31, 2018. As a trusted Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Krishnan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

138.     Additional reasons that demand on Defendant North is futile follow. Defendant North has served as a Company director since 2004 and currently serves as Lead Director. She

also serves as Chairman of the Governance & Nominating Committee and as a member of the Compensation Committee. Defendant North receives handsome compensation, including $302,427 during the fiscal year ended December 31, 2017. As a trusted Company director she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant North signed, and thus personally made the false and misleading statements in, the 2016 10-K. For these reasons, too, Defendant North breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

139.    Additional reasons that demand on Defendant Williams is futile follow. Defendant Williams has served as a Company director since 2015. He also serves as a member of the Audit & Compliance Committee. Defendant Williams receives handsome compensation, including $289,997 during the fiscal year ended December 31, 2017. As a trusted Company director and member of the Audit & Compliance Committee he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Williams signed, and thus personally made the false and misleading statements in, the 2016 10-K. For these reasons, too, Defendant Williams breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

140.    Additional reasons that demand on the Board is futile follow.

141.    Demand in this case is excused because the Directors, all of whom are named as defendants in this action, control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

142.    In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Code of Conduct, the Directors failed to comply with the law. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

143.    Defendants Clerico, Dinkins, Ely, Fry, and Williams, as members and/or Chairmen of the Audit & Compliance Committee, failed to properly maintain the internal controls for the Company's financial reporting and failed to properly oversee the Company's accounting practices.

144.    Community Health has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Community Health any part of the damages Community Health suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

145. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

146. The acts complained of herein constitute violations of fiduciary duties owed by Community Health officers and directors, and these acts are incapable of ratification.

147. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Community Health. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Community Health, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

148.    If there is no directors' and officers' liability insurance, then the Directors will not cause Community Health to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

149.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least six of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against Individual Defendants for Violations of Section 14(a) of the Exchange Act**

150.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

151.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

152.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of

such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

153.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

154.    Under the direction and watch of the Directors, the 2017 Proxy Statement failed to disclose, *inter alia*, that: (1) the Company under-recorded its bad accounts allowance; (2) the Company under-recorded its contractual adjustments; (3) consequently, the Company had over-recorded its net operating revenue; (4) similarly, the Company had under-recorded its net losses; and (5) the Company failed to maintain internal controls.

155.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ pay-for-performance elements including equity awards designed to "effectively align the interests of management with those of stockholders," while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

156.    The 2017 Proxy Statement also made references to the Code of Conduct. The Code of Conduct required the Company and the Individual Defendants to abide by relevant laws

and regulations and make accurate and non-misleading public disclosures. By engaging issuing false and misleading statements to the investing public, the Individual Defendants violated the Codes. The 2017 Proxy Statement failed to disclose these violations and also failed to disclose that the Code's terms were being violated.

157.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2017 Proxy Statement, including, but not limited to, election of directors, ratification of an independent auditor, and the advisory approval of executive compensation.

158.     The false and misleading elements of the 2017 Proxy Statement led to the re-election of Defendants Clerico, Ely, Fry, Hingtgen, Jennings, North, Smith, and Williams, which allowed them to continue breaching their fiduciary duties to Community Health.

159.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017 Proxy Statement.

160.     Plaintiff on behalf of Community Health has no adequate remedy at law.

## SECOND CLAIM

**Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

161.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

162.     The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Community Health. Not only is Community Health now defending

claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon Community Health by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase over a billion dollars of its own shares on the open market at artificially inflated prices, damaging Community Health.

163.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases and periodic and current reports filed with the SEC.

164.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Community Health not misleading.

165.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Community Health. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though

such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases and filings with the SEC.

166.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, made and signed the Company's Form 10-K filed with the SEC during the Relevant Period.

167.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

168.    Plaintiff on behalf of Community Health has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Violations of Section 20(a) of the Exchange Act

169.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

170.    The Individual Defendants, by virtue of their positions with Community Health and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Community Health and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Community Health to engage in the illegal conduct and practices complained of herein.

171.    Plaintiff on behalf of Community Health has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

172.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

173.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Community Health's business and affairs.

174.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

175.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Community Health.

176.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

177.    In further breach of their fiduciary duties owed to Community Health, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company under-recorded its bad accounts allowance; (2) the Company under-recorded its contractual adjustments; (3) consequently, the Company had over-recorded its net operating revenue; (4) similarly, the Company had under-recorded its net losses; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

178.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

179.    In breach of their fiduciary duties, the Individual Defendants in further breach of their fiduciary duties caused the Company to engage in repurchasing over $2.6 million worth of Company stock while the price of the Company's stock was artificially inflated.

180.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

181.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the

Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

182.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

183.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Community Health has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

184.    Plaintiff on behalf of Community Health has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

185.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

186.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Community Health.

187.    The Individual Defendants either benefitted financially from the improper conduct or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Community Health that was tied to the performance or artificially inflated valuation of Community Health, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

188.    Plaintiff, as a shareholder and a representative of Community Health, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all

profits—including from benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

189.    Plaintiff on behalf of Community Health has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

190.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

191.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

192.    In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

193.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

194.    Plaintiff on behalf of Community Health has no adequate remedy at law.

## PRAYER FOR RELIEF

195.    FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)      Declaring that Plaintiff may maintain this action on behalf of Community Health, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Community Health;

(c)     Determining and awarding to Community Health the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Community Health and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Community Health and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Community Health to nominate at least six candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Community Health restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: August 12, 2019

Respectfully submitted,

**FARNAN LLP**

Of Counsel:

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

Michael J. Farnan (Bar No. 5165)
919 N. Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777- 0301
Email: bfarnan@farnanlaw.com
Email: mfarnan@farnanlaw.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*